# Wheeling.

14  397
39  172

14  397
47  245

**BALDENBERG** *et al. v.* **WARDEN** *et al.*

Decided December 14, 1878.

1. Where a bill is filed for the specific performance of a parol contract, the contract must be set out with reasonable certainty, and proved substantially as alleged, or no decree can be made to enforce it; and the court may dismiss the bill, if the contract is not proved as alleged.

2. But where the contract proved varies from that set up in the bill, and the contract proved is clear and certain in its terms, and is such as a court of equity might properly enforce, and the court below decrees a specific execution of the contract set out in the bill, the decree must be reversed; but the Appellate Court will not dismiss the bill, but will remand the cause to the court below, to put the plaintiff to his election, whether to have a specific performance of the "contract as proved," or to have the same rescinded, and the parties put in *statu quo*.

1878
Special Term.

Appeal from and *supersedeas* to a decree of the circuit court of Raleigh county, rendered on the 27th day of April, 1875, in a cause in said court then pending, wherein Susan Baldenberg and others were plaintiffs, and Thomas Warden and David J. Warden and others were defendants, granted on the petition of said Thomas and David J. Warden.

Hon. Evermont Ward, judge of the ninth judicial circuit, rendered the decree appealed from.

JOHNSON, JUDGE, furnishes the following statement of the case.

In February, 1872, Susan Baldenberg in her own right, as widow of Hugh Warden, deceased, Alexander Warden, William T. Quesenberry and Martha, his wife, late Martha Warden, filed their bill, against Thomas Warden, David J. Warden, Letitia Warden, John T. Warden, Mary J. Warden, Charles A. Warden, Hugh J. Warden and Milton J. Warden, the last six infants. The bill alleged, "that in the year 18 — and in the lifetime of Hugh Warden, the said Thomas Warden gave to his son, Hugh Warden, a certain tract or parcel of land, which the said Thomas Warden possessed in fee at that time, lying and being in the county of Raleigh and State of West Virginia, situated on the waters of White Stick, adjoining the lands of John Warden, Edward Prince and others. The said Thomas Warden, had the said tract or parcel of land run off to the said Hugh Warden in his lifetime, and a plat made of the said land, and gave the said plat to the said Hugh Warden; and the said Thomas Warden induced his son Hugh, to move and settle upon the said tract or parcel of land; the said Thomas Warden at the same time promised the said Hugh Warden, that if he would settle upon the said tract or parcel of land, he would convey to the said Hugh Warden and heirs the legal title to the said tract or parcel of land, as soon as he would settle upon the said land; and for a further inducement for the said Hugh Warden to settle upon and improve the said tract of land, the said Thomas Warden had the said tract or parcel of land surveyed, and platted, and delivered to the said Hugh Warden the plat of the said boundary of land, promising at the same time to convey to the said Hugh Warden the legal title to the said land, as aforesaid."

The bill further alleges, that in pursuance of said contract, the said Hugh did move upon the said land,

and made valuable improvements, cleared land and built a house, built a saw-mill and grist-mill, and expended a large amount of money and labor upon the land, upon the faith that his father would keep his promise and make to him the legal title to said land. That said Thomas Warden put his son Hugh in possession of said land, and he remained in possession until his death in 18 —, and that he died leaving his widow Susan and eight children, the two named as plaintiffs, and the six infants defendants; that the said Thomas Warden had refused to comply with his promise, and would not convey said land to the said Hugh Warden in his lifetime; and since his death the said Thomas had refused to convey said land to the legal heirs of said Hugh; that the said Thomas Warden forced and compelled the widow and children of his son Hugh to leave and move off from said land; and on the day of ———, 1866, the said Thomas Warden re-entered upon the said land, and put D. J. Warden in possession thereof, including both the saw-mill and grist-mill; and the said David J. Warden has occupied said premises including the saw-mill and grist-mill since ———, and refuses to account for the rents and profits of the same, and that such rents and profits are worth, at least $150.00 per annum; that said D. J. Warden has cut much valuable timber, &c.

The bill charges conspiracy between Thomas Warden and his son David, and that said Thomas refuses to convey the said land, to the heirs of said Hugh Warden, and that David refuses to render any account for the rents and profits. The prayer of the bill is, that Thomas Warden be required to convey said land to the legal heirs of said Hugh Warden, and that David J. Warden be required to account for the rents and profits and for the timber by him taken from said land, &c.

Thomas Warden answered the bill, in which he denies making any contract with his son Hugh, by which he was required to convey to him the said land; that he "told Hugh, as he had others of his sons, to go upon his

land and do the best they could, and that he would fin-
ally, if they did well and showed a disposition to make a
living in the world, give it to them," and that Hugh
went upon the land with no other understanding. He
admits, that his son made improvements, but denies,
that he did to the extent charged in the bill; that while
his son was making improvements he says he advanced
to him two valuable horses; worth $100.00 each; that
he furnished provisions to a large amount to-wit $———
and fully intended at some time of life to convey to his
son one hundred acres of land, either at the place where
he settled or some other place, or property equivalent
thereto of other kind. He denies, that he drove the
plaintiffs from the land. He says they left it of their
own volition, and went to live on another tract of land
of defendant, that was much better. He says nothing in
particular about running off the land for Hugh, and giv-
ing him the plat, but in general "denies all and every
charge made by plaintiffs in their bill tending in anywise
to a contract, either written or parol, between him and
his said son."

David J. Warden answered the bill. He says, he
knows nothing of the pretended contract, and claims,
that he made an exchange of the Sand Branch place for
the place in controversy with Susan Baldenburg; says
he made valuable inprovements on said land, worth
$1,000.00; denies that he knew anything at the time of his
purchase of the land in controversy from his co-defend-
ant Thomas Warden, of the claim of Hugh Warden, or
his heirs; and denies the right to charge him with tim-
ber cut, or to charge him in any way. He does not say,
that he had a deed from his father, or that he had paid for
the land. He claims in his answer, that in 1867 Susan
Baldenburg being in possession of a part of the land in
the bill mentioned proposed an exchange with him for
the use and occupation of a tract of land on the Sand
Branch, then occupied by the defendant and belonging to
his co-defendant Thomas Warden, which proposition of

exchange he accepted, and said Susan agreed to transfer all her claim, right or title thereto to him.

Many depositions were taken in the cause. As to the contract, Mrs. Baldenberg in her deposition says: "When Hugh and I were married we settled on the Sand Branch, in the year 1852, on the land of Thomas Warden. We lived there upwards of one year and to the best of my knowledge Hugh cleared about six acres on the Sand Branch farm, and put up a stable; and in 1854 removed to the land in controversy, and *Hugh put up the mill there and was to do his father's grinding toll free his lifetime;* and when we moved on the land in controversy, it was my understanding that Hugh was to have it; I heard Thomas Warden and Hugh say so. Hugh wanted to go to Indiana, and I was unwilling to go there, and his father prevailed with him to stay; and it was my understanding, that Thomas Warden agreed to make Hugh a title to the land, if he would stay; and the land was run off by agreement of the parties, Thomas Warden and Hugh, by Richard McVey and Thomas Warden; Hugh, John Warden, and Philip Lykens, I think, were there, when the land was run off, and they run off one hundred and forty-nine acres, which includes the mill; Mr. McVey made a plat and certificate of survey of the land; which I found among the papers of my husband after his death."

John Warden in his deposition says: "Hugh lived on a piece of land that I helped to run off; and my father and Hugh both said it was run off for Hugh; father helped to run it off. Hugh lived on it at the time it was run off, and continued to live on it until his death, about five or six years I think ; he improved it by clearing some eight or ten acres of land, built a dwelling house, a stable, and put up a saw-mill, and attached a grist-mill to it; and Hugh exercised ownership over the land and mill, and it always went by the name of Hugh Warden's mill. *Father's grain was ground toll free,* which was the understanding between them I believe."

1878
Special Term.
———————
Baldenberg *et al.*
v.
Warden *et al.*

Nancy Warden in her deposition says: "Hugh Warden lived where D. J. Warden now. lives, and became dissatisfied, and went to his father Thomas Warden, and told him, if he did not make him a title to his place, he would not work there any more, his father told him to go to work and content himself, and he would make him a right to-morrow, if he wanted it. I know that they were to run off land for Hugh; and Hugh said it was for him; and it was my understanding, that Hugh was to have the mill, and *Thomas Warden was to have his grinding done toll free;* and I understood it also, that the lines run included the mill. I think that Thomas Warden said that the fence was to be put on the line that was run by McVey from the creek up, adjoining John Warden's land."

Nancy Carper, a witness for the defendants, in her deposition says: "Hugh went to my father and told him, that he wanted to go to the mill, something like eighteen years ago; and my father, Thomas Warden told him, that he would not part from the mill and twenty acres; and my father told Hugh, that he could go there, and take charge of the mill, if he would *do his grinding and sawing free.* My father told Hugh, that he expected to give all his children a hundred acres of land; and if he wished he could build adjoining the mill on twenty acres that I spoke of above." This is the only witness that says anything about *"sawing"* to be done free. Her deposition was taken in 1872. The conversation she heard took place before Hugh moved on the land, and before it was run off by McVey.

John N. Godby, a witness for defendants, in his deposition says: "I heard a contract between Thomas Warden and Hugh, by which Thomas Warden was to have the mill and fifty acres around it, including the mill-site, where the present mill is located." He does not state when such contract was made, or what the terms of it were. In answer to questions he says: "The house of David J. Warden, was included in the reserve made by

1878
Special Term.
Baldenberg et al.
v.
Warden et al.

Thomas Warden." His character for truth and veracity is successfully impeached by plaintiffs; and no attempt, made to corroborate him by defendants.

The evidence of Robt. Warden is, that he never heard of any reserve, that the land was run off by Richard McVey and a plat made of it, that he had seen the plat; that he was shown some three or four of the corner trees by Hugh Warden and Thomas Warden, he thought the plat called for one hundred and forty-nine acres. The boundary included the saw-mill and grist-mill. In answer to the question : "State whether or not you ever heard your father Thomas Warden say whether there was any reserve made or not," said : "Of course; my father Thomas Warden acknowledged here that there never was any reserve."

There was much evidence taken as to the rents and profits of the land claimed by plaintiffs and defendant D. J. Warden, and also as to the value of timber taken by said D. J. Warden from the land claimed by the plaintiffs, and the cause was referred to a commissioner to ascertain the rents and profits and amount and value of timber taken, &c., and the commissioner returned his report.

On the 27th of April, 1875, the court entered a decree declaring that the contract as set up in the bill was proved, that the heirs of Hugh Warden were entitled to a specific performance thereof; and then recited a fact, not in the pleadings at all, that Thomas Warden had conveyed a part of the Sand Branch tract to Martha Quesenberry, one of the children of Hugh Warden, "therefore unless the said Thomas Warden shall convey to the widow and the remaining children of said Hugh Warden, deceased, the residue of the Sand Branch tract by metes and bounds within sixty days from this date, * * or shall convey to the widow and other heirs of said Hugh Warden, deceased, the said one hundred and forty-nine acre tract, then it is adjudged, ordered and decreed, that Martin H. Holt, who is hereby appointed a special commissioner for that purpose, do convey to the said widow

and heirs of the said Hugh Warden the one hundred and forty-nine acre tract by metes and bounds, as set out in the survey made in the cause, &c.," and gave costs in favor of plaintiffs.

From this decree Thomas Warden and David J. Warden appealed.

*James H. McGinnis,* for appellants, cited the following authorities:

4 H. & M. 92, 110; 2 Tuck. Com. 452; 21 Gratt. 23; 2 Leigh 569; 6 Gratt. 78.

*H. W. Brazie,* for appellees, cited the following authorities:

2 Story's Eq. §717; 1 Mad. Ch. Pr. 295; 18 Ga. 473; 9 Ohio St. 511; 2 Story's Eq. §751; Bouvier's L. Dict. "Performance"; *Id.* "Specific Performance."

JOHNSON, JUDGE, delivered the opinion of the Court:

The first error assigned is, that the demurrer to the bill was overruled. I think the bill is sufficient. It shows, that on the faith of the promise of his father Hugh went on the land and made valuable improvements; that his father had the land surveyed to him, and the plat was delivered to his son, before the valuable improvements were made.

It is objected, that the contract as alleged in the bill is not proved; and therefore there should have been no decree for specific performance.

It is true, that there is a material variance in the contract as alleged and that proved. It is strange, that in this cause it should be so, as the deposition of Mrs. Baldenberg shows what the contract was, and her statement of it is corroborated by the circumstances and other evidence in the cause. The only material variance is, that the bill fails to allege as a part of the parol contract the material fact, that the said Hugh Warden, as part of the consideration for the tract of one hundred and forty-nine acres of land including the mill-site, was

during the lifetime of his father Thomas Warden to do the grinding of the said Thomas "toll free," or free of toll. There is nothing in the evidence to show, that he did not do so. About the beginning of the war Hugh went into the army, and was killed near the close of the war. This may account for the delay in bringing the suit. What decree, if any, could the court properly have entered. ?

In *Bradford et al.* v. *The Union Bank of Tennessee,* 13 How. 69, Mr. Justice Nelson in delivering the opinion of the Court said: "The more modern course of proceeding is to dispense with the cross-bill, and make the same decree upon the answer to the original bill, that would be made, if a cross-bill had been filed, if the defendant submits in his answer to a performance of the real agreement between the parties. The answer is viewed in the light of a cross-bill, and becomes the foundation for a proper decree by the court. This practice has been adopted as most convenient and expeditious in settling definitively the rights of the parties, and for the sake of saving further litigation and expense."

In the case of *Stapylton* v. *Scott,* 13 Ves. 425, the Master of the Rolls dismissed the cross-bill with costs, considering it unnecessary, as the court would upon the answer decree a specific execution of what was the real agreement. This practice was followed by Lord Eldon in *Fife* v. *Clayton,* 13 Ves. 546, on the ground that it was right in principle and would save expense. A specific performance was also decreed upon the answer in *Gwynn* v. *Lethbridge,* 14 Ves. 585; and it appears now to be a very common practice in chancery proceedings. 1 Daniel Ch. Pr. 436 and notes; 2 *Id.* 101, 102 and note; Story's Eq. Pl. §394.

These cases refer more particularly to the right of the defendant to have a decree for a specific execution of the agreement according to the answer, so that he may be saved the expense of a cross-bill, even against the claim of the plaintiff to have his bill dismissed.

The same principle however seems to be equally applicable to the complainant, where he insists upon the decree for specific performance of the contract as established by the proofs, although different from that set up in the bill. Indeed we preceive no solid distinction between the two cases. In both the contract of course, when ascertained and conformed to the real understanding of the parties, must be such a one, as the court deems fit and proper to be enforced, 2 Daniel, Ch. Pr, 1001, 1002; *London and Birmingham Railway Co.* v. *Winter*, Cr. & Ph. 62.

We shall adopt this practice in the disposition of this cause, as it will save all further litigation and expense, and settle the rights of the parties, as in our judgment the principles of equity and justice demand.

If we could accept the above as the rule of equity practice in Virginia and this State, we would have no difficulty here in disposing of the cause before us, as we believe justice and the rights of the parties require, by decreeing a specific execution of the contract, as disclosed by the proofs.

Judge Christian, in his opinion in *McComas* v. *Easley*, 21 Gratt. 23, cites the authorities, or a part of them, referred to in *Bradford* v. *Bank*, 13 How., and also refers to the latter case ; but the principle, which he lays down and which he approves, is : " The appellee having failed to establish by proof the contract, which he sets out, and seeks to enforce, and the evidence in the cause having established a different contract between the parties, the court ought either to have dismissed the bill, or put him to his election, either to have the *contract as proved* executed, or rescinded. It was clearly error in the court below to decree specific execution of the contract, which he sought to enforce. The evidence shows, that there was no such contract, but that the contract was entirely different. The court might have dismissed the bill ; for it is well settled, that a party coming into a court of equity asking for the specific execution of a contract, must state

his contract with reasonable certainty, and prove it as stated; and if there be any material difference between the allegations and the proof, the court may dismiss the bill, and leave the parties to their remedy at law. Fry on Specific Per. 165; *Anthony* v. *Leftwich*, 3 Rand. 238," and he might have added, *Pigg* v. *Corder*, 12 Leigh 69.

He further says: "but every bill for the specific execution of a contract is an application to the sound discretion of the court. It is not a case requiring the interposition of the court *ex debito justitiæ*, but rests in their discretion upon all the circumstances of each particular case. In the language of Lord Eldon, in 13 Ves. 331: 'The jurisdiction is not compulsory upon the court, but the subject of its discretion; the question is not what the court *must* do, but what it *may* do under the circumstances, either exercising the jurisdiction by by granting the specific performance, or abstaining from it.' And long previous to him Lord Hardwicke and other eminent equity judges in England had in a great variety of cases asserted the same discretionary power of the court."

"Of course the discretion to be exercised is not an arbitrary and capricious one, depending upon the mere pleasure of the court, but one which is to be exercised and controlled by the established doctrines and settled principles of equity, governed by the circumstances of each particular case. * * * In the case before us, we think it would be most equitable not to dismiss the plaintiffs' bill, and remit the parties to their legal rights. Where equity can do complete justice between the parties, it will never turn them out of court to pursue their remedy at law. 1 Mun. 63; 5 Pet. 263." (See *West. M. & M. Co.* v. *Va. C. C. Co.* 10 W. Va. 250.) "But a court of equity having complete jurisdiction of the parties and the subject matter, should make such decree, as will settle the rights of the parties, do complete justice between them, and close the controversy forever. We are therefore of opinion, that while the plaintiff cannot have

specific execution of the contract he seeks to enforce, yet under the circumstances of this case he ought to have his election (see *Hook* v. *Ross*, 1 H. & M. 310) either to have the contract rescinded, or have it performed in accordance with the agreement as proved."

The court rendered the decree and remanded the cause to the circuit court to put the plaintiff to his election, either to perform the contract as proved, or to have the same rescinded, and if he should refuse to perform the same or elect to have the same rescinded within a reasonable time, he should deliver up the house and lot to the appellant, and an account should be taken, &c.

The principles announced in the above cause are not contradictory to the Virginia and West Virginia authorities upon the subject of specific performance of parol contracts. It is not mandatory upon the Court to dismiss the bill in every case, where there is a variance between the contract alleged and the contract proved. In the case of *Anthony* v. *Leftwich*, 3 Rand., no contract was satisfactorily proved to the majority of the court. In *Pigg* v. *Corder*, 12 Leigh, no contract was proved, nor was any contract proved in *Patrick & Lovell* v. *Horton*, 3 W. Va. 23, and in the two latter cases, the court properly dismissed the bill.

Syllabus 1.    Where a bill is filed for the specific performance of a parol contract, the contract must be set out with reasonable certainty, and proven substantially as alleged, or no decree can be made to enforce it ; and the court may dismiss the bill, if the contract is not proved as alleged.

Syllabus 2    But where the contract proved varies from that set up in the bill, and the contract proved is clear and certain in its terms, and is such as a court of equity might properly enforce, and the court below decrees a specific execution of the contract set out in the bill, the decree must be reversed ; but the Appellate Court will not dismiss the bill, but will remand the cause to the court below, to put the plaintiff to his election, either to have a specific execution of the "contract as proved," or to have the same rescinded, and the parties put in *statu quo*.

It seems to me, that this is a cause, in which the latter course ought to be pursued. It would be inequitable to the heirs of Hugh Warden to dismiss the bill under the circumstances of this case. The decree was certainly erroneous in decreeing the performance of a contract not proved. It was also erroneous in decreeing title to be made to the widow, as well as the heirs at law, of Hugh Warden; and in giving the election to the defendant Thomas Warden to convey the Sand Branch tract, or the tract referred to in the contract. The widow had no right to exchange places with the defendant D. J. Warden. The contract as proved was, that Hugh Warden was to have a title to the one hundred and forty-nine acres as surveyed by Richard McVey, and Hugh was to go on to the land and improve it, and as a part of the consideration was to do the grinding of Thomas Warden during his, Thomas Warden's, life toll free, of course that meant such grinding of grain as he and his family should need for their use. The deed should have contained that charge on the land.

For the foregoing reasons the decree of the circuit court of Raleigh county, rendered in this cause, on the 27th day of April, 1875, is reversed; and the appellants Thomas Warden and D. J. Warden must recover of the appellees Susan Baldenberg, Alexander Warden, and William T. Quesenberry their costs about their appeal expended; and this cause is remanded to the circuit court of Raleigh county, that the said widow and heirs at law of Hugh Warden, deceased, be put to their election, either to have a specific performance of said contract, as proved and hereinbefore set out, or to have the same rescinded; and if they should elect to have the same performed, the said court should enter a decree requiring said defendant, Thomas Warden, within such reasonable time as it shall appoint, to execute and deliver with covenant of special warranty a deed to one hundred and forty-nine acres as shown by the plat of said Richard McVey and the survey made in this cause, to the said

1878
Special Term.

Baldenberg et al.
v.
Warden et al.

legal heirs of Hugh Warden, deceased, making a charge in said deed against said land, that said heirs during the lifetime of him, the said Thomas Warden, should do, or cause to be done, at said mill on said land "his, Thomas Warden's, grinding toll free," and said deed shall be made subject to the widow's dower in said land; and in default of the said Thomas Warden within such reasonable time to make said deed, the said court shall appoint a commissioner to execute and deliver the same to said heirs. And if such election, to have the said contract performed, or rescinded, shall not by said widow and heirs be made within a reasonable time, the bill shall be dismissed with costs, but if they should within such time elect to have said contract rescinded, then the said court shall cause an account to be taken, unless it is satisfied with the account already taken, in which said Thomas Warden shall be charged with the value of all the permanent improvements put upon said tract of one hundred and forty-nine acres of land by said Hugh Warden or his widow and heirs, and shall be credited with the reasonable rents and profits of said land; and said court shall further proceed with said cause according to the principles of this opinion and further according to the rules and practice governing courts of equity.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED.    CAUSE REMANDED.